## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| CLIFFORD K. POWER, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Civil Action No. 08-147 |
| | ) |
| MICHAEL J. ASTRUE, | ) |
| Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM OPINION

### I.    INTRODUCTION

Pending before the Court are cross-motions for summary judgment filed by Plaintiff Clifford K. Power and Defendant Michael J. Astrue, Commissioner of Social Security. Plaintiff seeks review of final decisions by the Commissioner denying his claims for disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401 *et seq.* and supplemental security income benefits ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381 *et seq.* For the reasons discussed below, Defendant's motion is granted and Plaintiff's motion is denied.

### II.    BACKGROUND

#### A.    Factual Background

Clifford K. Power was born in 1959 and graduated from high school in 1977. (Certified Copy of Transcript of Proceedings before the Social Security Administration, Docket No. 6, "Tr.," at 78.)    He later received specialized training as an auto mechanic

for about ten months and worked in that occupation from 1989 through 1995. (Tr. 74, 78.) He was forced to quit, however, after a back injury in 1996 and ongoing back problems which he attributed to being bent over eight hours each day. (Tr. 74, 237.) In 1997, he was employed as a school bus driver but lost that job in 2002 when he was arrested for driving while under the influence of alcohol or drugs. (Tr. 74, 216.)

B.  Procedural Background

Plaintiff applied for supplemental security income and for a period of disability and disability insurance benefits on December 31, 2003, and January 15, 2004, respectively, alleging disability as of April 19, 2002, hepatitis C, back problems, a sleep disorder, and alcoholism. (Tr. 73.) Following denial of both applications at the state agency level on June 8, 2004, he sought a hearing before an Administrative Law Judge ("ALJ") which was held by the Honorable William E. Kenworthy on January 11, 2006. On February 16, 2006, Judge Kenworthy issued his decision, again denying benefits. (Tr. 13-20.) The Social Security Appeals Council declined to review the ALJ's decision on December 12, 2007, finding no reason pursuant to its rules to do so. (Tr. 5-7.) Therefore, the February 16, 2006 opinion became the final decision of the Commissioner for purposes of review. 42 U.S.C. § 405(h); Rutherford v. Barnhart, 399 F.3d 546, 549-550 (3d Cir. 2005), citing Sims v. Apfel, 530 U.S. 103, 107 (2000). Plaintiff filed

2

suit in this Court on February 1, 2008, seeking judicial review.

## C. Jurisdiction

This Court has jurisdiction by virtue of 42 U.S.C. § 1383(c)(3) (incorporating 42 U.S.C. § 405(g)) which provides that an individual may obtain judicial review of any final decision of the Commissioner by bringing a civil action in the district court of the United States for the judicial district in which the plaintiff resides.

## III. STANDARD OF REVIEW

The scope of review by this Court is limited to determining whether the Commissioner applied the correct legal standards and whether the record, as a whole, contains substantial evidence to support the Commissioner's findings of fact. 42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389 (1971); Schaudeck v. Comm'r of Soc. Sec. Admin., 181 F.3d 429, 431 (3d Cir. 1999). Findings of fact by the Commissioner are considered conclusive if they are supported by "substantial evidence," a standard which has been described as requiring more than a "mere scintilla" of evidence, that is, equivalent to "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson, id. at 401. "A single piece of evidence will not satisfy the substantiality test if the [ALJ] ignores, or fails to resolve a conflict, created by countervailing evidence." Kent v. Schweiker, 710 F.2d 110, 114 (3d Cir. 1983).

3

This Court does not undertake *de novo* review of the decision and does not re-weigh the evidence presented to the Commissioner. Schoengarth v. Barnhart, 416 F. Supp.2d 260, 265 (D. Del. 2006), *citing* Monsour Medical Center v. Heckler, 806 F.2d 1185, 1190 (3d Cir. 1986) (the substantial evidence standard is deferential, including deference to inferences drawn from the facts if they, in turn, are supported by substantial evidence.) If the decision is supported by substantial evidence, the Court must affirm the decision, even if the record contains evidence which would support a contrary conclusion. Panetis v. Barnhart, CA No. 03-3416, 2004 U.S. App. LEXIS 8159, *3 (3d Cir. Apr. 26, 2004), *citing* Simmonds v. Heckler, 807 F.2d 54, 58 (3rd Cir. 1986), and Sykes v. Apfel, 228 F.3d 259, 262 (3rd Cir. 2000).

## IV. LEGAL ANALYSIS

### A. The ALJ's Determination

In determining whether a claimant is eligible for supplemental security income, the burden is on the claimant to show that he has a medically determinable physical or mental impairment (or combination of such impairments) which is so severe he is unable to pursue substantial gainful employment[1] currently existing

---

[1] According to 20 C.F.R. § 416.972, substantial employment is defined as "work activity that involves doing significant physical or mental activities." "Gainful work activity" is the kind of work activity usually done for pay or profit.

4

in the national economy.[2] The impairment must be one which is
expected to result in death or to have lasted or be expected to
last not less than twelve months. 42 U.S.C. § 1382c(a)(3)(C)(i);
Morales v. Apfel, 225 F.3d 310, 315-316 (3d Cir. 2000). To be
granted a period of disability and receive disability insurance
benefits, a claimant must also show that he contributed to the
insurance program, is under retirement age, and became disabled
prior to the date on which he was last insured. 42 U.S.C.
§ 423(a); 20 C.F.R. § 404.131(a). Defendant does not dispute that
Mr. Power satisfied the first two non-medical requirements and the
parties do not object to the ALJ's finding that Plaintiff's date
last insured was December 31, 2007. (Tr. 15.)

To determine a claimant's rights to either SSI or DIB,[3] the
ALJ conducts a formal five-step evaluation:

    (1)  if the claimant is working or doing substantial gainful
         activity, he cannot be considered disabled;

    (2)  if the claimant does not suffer from a severe impairment
         or combination of impairments that significantly limits
         his ability to do basic work activity, he is not
         disabled;

    (3)  if the claimant does suffer from a severe impairment
         which meets or equals criteria for an impairment listed
         in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("the

---

[2] The claimant seeking supplemental security income benefits must
also show that his income and financial resources are below a certain
level. 42 U.S.C. § 1382(a).

[3] The same test is used to determine disability for purposes of
receiving either DIB or SSI benefits. Burns v. Barnhart, 312 F.3d
113, 119, n.1 (3d Cir. 2002). Therefore, courts routinely consider
case law developed under both programs.

5

Listings") and the condition has lasted or is expected to last continually for at least twelve months, the claimant is considered disabled;

(4) if the claimant retains sufficient residual functional capacity ("RFC")[4] to perform his past relevant work, he is not disabled; and

(5) if, taking into account the claimant's RFC, age, education, and past work experience, the claimant can perform other work that exists in the local, regional or national economy, he is not disabled.

20 C.F.R. § 416.920(a)(4); see also Morales, 225 F.3d at 316.

In steps one, two, and four, the burden is on the claimant to present evidence to support his position that he is entitled to Social Security benefits, while in the fifth step the burden shifts to the Commissioner to show that the claimant is capable of performing work which is available in the national economy.[5] Sykes v. Apfel, 228 F.3d 259, 263 (3d Cir. 2000).

Following the prescribed analysis, Judge Kenworthy concluded at step one that Mr. Power had not engaged in substantial gainful activity at any time relevant to his decision, that is, between April 19, 2002 through February 16, 2006. (Tr. 15.) Resolving step two in Plaintiff's favor, the ALJ concluded that Mr. Power

---

[4] Briefly stated, residual functional capacity is the most a claimant can do despite his recognized limitations. Social Security Ruling 96-9p defines RFC as "the individual's maximum remaining ability to perform work on a regular and continuing basis, i.e., 8 hours a day, for 5 days a week, or an equivalent work schedule."

[5] Step three involves a conclusive presumption based on the listings, therefore, neither party bears the burden of proof at that stage. Sykes, 228 F.3d at 263, n.2, citing Bowen v. Yuckert, 482 U.S. 137, 146-147 n.5 (1987).

6

suffered from hepatitis C, degenerative disc disease, and right shoulder tendonitis, all of which were "severe" as that term is defined by the Social Security Administration.[6]  (Tr. 15-16.) Although Plaintiff had also received treatment for a mood disorder, alcohol abuse, and a history of polysubstance abuse in doubtful sustained remission, the ALJ concluded Plaintiff's mood disorder was not severe inasmuch as it imposed no more than minimal functional restrictions. (Tr. 16.)

At step three, the ALJ concluded Plaintiff's severe impairments did not satisfy any of the criteria in Listing 5.05, pertaining to chronic liver disease, or the musculoskeletal listings, presumably Listing 1.04. (Tr. 16.) He further concluded at step four that Mr. Power had

> the residual functional capacity to perform tasks at the light exertional level, lifting up to 20 pounds occasionally, [and] avoiding tasks that would involve a rapid production pace, frequent changes in job assignments or similar sources of a high level of work place stress.

(Tr. 16.)

At the hearing, Samuel Edelman, M.Ed., a vocational expert

_____

[6]    *See* 20 C.F.R. §§ 404.1520(c), 404.1521(a), and 140.1521(b), stating that an impairment is severe only if it significantly limits the claimant's "physical ability to do basic work activities," i.e., "abilities and aptitudes necessary to do most jobs, including, for example, walking, standing, sitting, lifting, pushing, pulling, reaching, carrying or handling," as compared to "a slight abnormality" which has such a minimal effect that it would not be expected to interfere with the claimant's ability to work, regardless of his age, education, or work experience. Yuckert, 482 U.S. at 149-151. The claimant has the burden of showing that the impairment is severe. Id. at 146, n.5.

7

("VE"), had testified that Plaintiff's previous work as an auto mechanic was characterized as a semi-skilled medium exertion-level job and that his work as a school bus driver was semi-skilled and light.[7] (Tr. 18, see also Tr. 463.) However, because the latter sometimes involved a level of stress Plaintiff could not tolerate, the ALJ concluded Plaintiff could not return to either of his past relevant jobs. Mr. Edelman further testified, in response to the ALJ's hypothetical question, that there were other light, unskilled occupations in the national economy such as stock clerk, office cleaner or hotel cleaner which a person of Mr. Power's age, education, work experience, and RFC could perform. (Tr. 19, see also Tr. 463.) Based on Plaintiff's status as a younger individual[8] with a high school education, the ability to communicate in English, a work history which provided no readily transferable skills, the medical evidence of record, and the testimony of the vocational expert, the ALJ determined at step five that Plaintiff was capable of making a successful adjustment to other work and thus had not been disabled at any time between April 19, 2002, and the date of his opinion. (Tr. 19.)

---

[7] The ALJ erroneously referred to the occupation of school bus driver as unskilled, rather than semi-skilled as Mr. Edelman testified. This error is inconsequential inasmuch as the ALJ concluded Mr. Power could not return to that job because of the potential stress of "dealing with a bus full of school-age children." (Tr. 18.)

[8] Plaintiff was 43 years old on his alleged onset date, making him a "younger" person according to Social Security regulations. 20 C.F.R. § 404.1563(c).

8

## B.    Plaintiff's Arguments

In the brief in support of his motion for summary judgment, Mr. Power raises two arguments. First, the ALJ erred as a matter of law by ignoring uncontradicted evidence from Plaintiff's current psychiatrist that he was unable to work due to his mental health impairments and from his previous psychiatrist that his functioning was seriously impaired. Thus, his conclusion that Plaintiff's depression was not a severe impairment was erroneous and therefore requires remand for further consideration. (Plaintiff's Brief in Support of Motion for Summary Judgment, Doc. No. 9, "Plf.'s Brief," at 7-14.) This decision resulted in the second error by the ALJ, that is, he posed an inaccurate hypothetical question which failed to set forth all of Plaintiff's specific work-related limitations of function. Consequently, the VE's answer to the question cannot be considered substantial evidence on which the ALJ could rely in reaching his conclusion that there were other occupations Plaintiff could perform in the national economy. Again, Plaintiff contends, the case must be remanded for further consideration. (Id. at 15.)

Because Plaintiff does not raise any objections to the ALJ's analysis of the medical evidence regarding his degenerative disk disease, tendonitis, and hepatitis C, we mention those impairments only in the context of discussing the evidence concerning Plaintiff's mental impairments.

9

1. *Medical evidence of Plaintiff's mental impairments:*
When he applied for Social Security benefits in December 2003 and January 2004, Plaintiff did not claim that his disability was due, even in part, to any mental impairments. (*See* Disability Report - Adult, dated January 23, 2004, alleging disability as of April 19, 2002, due to hepatitis C, "back problem," sleep disorder and alcoholism, Tr. 73-79.) In the same form, although he indicated he had received treatment for emotional or mental problems which limited his ability to work, he did not identify the source of such treatment, only mentioning Dr. Michael A. Schlossberg who had treated his sleep disorder. In fact, he noted that his first appointment with Mon Yough Community Services (where he eventually received mental health treatment) would not be until January 22, 2004, again relative to his sleep disorder. (Tr. 75-77.)

There is no evidence of any mental health treatment prior to February 18, 2004, when Plaintiff consulted Mon Yough Community Services. At the initial evaluation, his primary complaints were his inability to sleep and his constant thirst. He denied any crying spells and feeling hopeless, helpless or worthless, although he did indicate problems with energy and an inability to concentrate. He denied suicidal thoughts or attempts, feelings of aggression or violence, and panic attacks; he showed no signs or symptoms of mania, hypomania, perceptual disturbances, or paranoia. In addition to chronic use of alcohol, he reported having used

10

marijuana, cocaine, and intravenous drugs until 1996, but denied any current use. In the mental status exam, Dr. Khairul Alam noted Plaintiff was very well dressed and groomed, had no psychomotor changes, and had good eye contact. His affect was anxious but bright; his mood was congruent. Although his speech was normal, he talked "obsessively" about his sleep and stomach problems. His thought process was oriented and his knowledge and intelligence were described as "super considering his age, education and cultural background." His memory and concentration were intact. His reasoning was good, but he had "no insight whatsoever into his own problem" and was "trying to minimalize [sic] and rationalize his alcohol use." His emotional problems were characterized by anxiety and somatic preoccupation. Dr. Alam's initial assessment was mood disorder, NOS, alcohol abuse, rule out alcohol dependence, history of polysubstance abuse and dependency in doubtful sustained remission, rule out mood disorder secondary to alcohol, rule out major depression, recurrent, non-psychotic, and moderately severe. He noted that Plaintiff's Global Assessment of Functioning ("GAF") score at the time was 50.[9] The psychiatrist's recommendations were

---

[9] The GAF scale assesses how well an individual can function according to psychological, social, and occupational parameters, with the lowest scores assigned to individuals who are unable care for themselves. Drejka v. Barnhart, CA No. 01-587, 2002 U.S. Dist. LEXIS 7802, *5, n2 (D. Del. Apr. 18, 2002). A GAF score between 41 and 50 reflects "serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." See the on-line version of *Diagnostic and Statistical Manual of Mental Disorders*, Multiaxial Assessment,

11

to maintain sobriety and participate in mental health therapy; he prescribed Paxil instead of Klonopin[10] as well as Vistaril.[11] (Tr. 166-168.)

In a follow-up visit on March 17, 2004, Dr. Alam noted that Plaintiff had abstained from alcohol for more than a month and a half, but was still experiencing extreme somatic preoccupation characterized by chronic thirst and dehydration. "He mentioned that his mood is better and he can handle his stress better since he started Paxil. He is not as depressed as he used to be." He noted that Plaintiff's affect was "brighter than before" and that his speech was "normal, coherent and goal directed." Dr. Alam's assessment at that time was depression and anxiety disorder, NOS, rule out major depression and generalized anxiety disorder; he

American Psychiatric Association (2002) ("Online DSMMD-IV") at www.lexis.com., last visited March 3, 2009.

[10] According to the disability report, Dr. Schlossberg had prescribed Klonopin to treat Plaintiff's sleep disorder. (Tr. 77.) Plaintiff later reported that it had been prescribed for his depression in approximately 2002 (Tr. 142), but there are no references to depression in Dr. Schlossberg's notes which cover the period September 25, 2001, to December 17, 2003. (See Tr. 114-134.)

[11] Klonopin (clonazepam) is used to treat anxiety and other mental impairments. Paxil (paroxetine) is used to treat depression, panic disorder, social anxiety disorder, obsessive compulsive disorder, generalized anxiety disorder, and posttraumatic stress disorder. Paroxetine is in a class of antidepressants called selective serotonin reuptake inhibitors ("SSRI") which work by increasing the amount of serotonin, a natural substance in the brain that helps maintain mental balance. Among other uses, Vistaril (hydroxyzine) is used to treat anxiety and the symptoms of alcohol withdrawal. *See* drugs and supplements information available at the National Institute of Medicine's on-line website, www.nlm.nih.gov/medlineplus (last visited March 4, 2009), "Medline Plus."

12

rated Mr. Power's GAF at 59.[12]  He recommended continuing abstinence and compliance with medication and therapy; Plaintiff's dosage of Paxil was increased and he was given a prescription of Trazodone for his on-going sleep problems.   (Tr. 165.)

The final entry from Dr. Alam's notes is dated April 14, 2004, when Mr. Power reported total abstinence from alcohol for two months and improvement with Paxil, i.e., decreased tiredness, improved mood, and better functioning.   He continued to have problems with sleep and claimed only Klonopin was able to help him in that regard.   Dr. Alam described his affect as bright, his speech as clear, and his insight/judgment as fair.  His assessment was essentially the same as in March, although he did not assign a GAF score.   Dr. Alam continued the prescription of Paxil and renewed the Klonopin prescription since Plaintiff had already started taking tablets left over from a previous prescription. (Tr. 164.)

Plaintiff apparently did not receive any mental health treatment from April 14, 2004, until November 9, 2004, when he began treating at Turtle Creek Valley Mental Health/Mental Rehabilitation Services ("TCV MH/MR.")  In the initial assessment, Plaintiff reported essentially the same medical history and

_____

[12]  A GAF score between 51 and 60 is indicative of "moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." *See* Online DSMMD-IV.

13

complaints as he had to Dr. Alam at Mon Yough Community Services. He stated he had been treated for depression at Mon Yough from December 2003[13] through April 2004 and had left because he did not like his therapist. His primary concern was poor sleep, which he described as "sleep depression." He also reported lack of energy, low motivation, irritability, and feeling helpless. He had not been taking his medication for depression although he thought Paxil and Klonopin had helped and had returned to drinking alcohol about once a week. All aspects of the mental status exam were within normal limits except a blunt/restricted emotional expression, an expressionless face, poor insight and depressed mood. Angela Hauck, a licensed social worker, diagnosed Mr. Power with depressive disorder NOS and alcohol abuse; she recommended individual therapy. (Tr. 220-234.)

In a psychiatric evaluation performed by Dr. Gail Kubrin on December 22, 2004, Mr. Power reported depression since 1985 when he "felt that something happened to his insides" and he subsequently developed chronic thirst and insomnia. He was depressed "only because of the sleep deprivation." Dr. Kubrin described Plaintiff as "rather tense" and guarded, but cooperative. He displayed some symptoms of depression and anxiety and his thought processes, while organized, focused almost exclusively on his sleep problems, with

---

[13] This date is inconsistent with the medical records provided which, as previously noted, indicate the initial assessment took place on February 18, 2004.

14

little detail about other issues. His idea that something had happened to twist his stomach, resulting in his physical and mental problems, was described as "not clearly delusional, but unusual." His insight and judgment were considered limited. Dr. Kubrin noted Ms. Hauck's diagnoses of depressive disorder NOS and alcohol abuse, as well as his GAF which was currently assessed at 55. Dr. Kubrin replaced Paxil with Lexapro,[14] restarted his Klonopin, and recommended no alcohol, support group participation, and individual therapy. (Tr. 216-219.)

In a second medication check on February 16, 2005, Dr. Kubrin noted Plaintiff seemed less depressed but was anxious, with a continued focus on his thirst and insomnia. His insight and judgment were now considered within normal limits. He reported continued sleep problems, even with Klonopin, and had undergone a sleep study which showed no sleep apnea but a very long latency and only 35% efficient sleep. He had not been drinking since the previous Christmas. Dr. Kubrin continued his prescriptions of Lexapro and Klonopin and added Seroquel.[15] (Tr. 213-215.)

---

[14] Lexapro (escitalopram) is used to treat depression and generalized anxiety disorder. Like Paxil, Lexapro is a SSRI. See drugs and supplements information at Medline Plus.

[15] Seroquel (quetiapine) is generally used to treat the symptoms of schizophrenia and episodes of mania or depression in patients with bipolar disorder. See drugs and supplements information at Medline Plus. It is unclear why Dr. Kubrin prescribed this drug since there is no evidence of schizophrenia or bipolar disorder in the medical record.

15

On April 13, 2005, Dr. Kubrin's evaluation was essentially unchanged from that of February except she reported Plaintiff was "somewhat calmer, less intense" and he showed less anxiety and depression. At the time, he was waiting to undergo interferon treatment for hepatitis C and was anxious about the severe side effects he expected to experience, a mental state which she described as "mildly paranoid." Mr. Power reported no alcohol use and that "his mood was better due to meds as well as not drinking." He was not sleeping well and had stopped taking Seroquel because even a low dosage gave him a "very drugged feeling." Dr. Kubrin noted he would need to be closely monitored psychiatrically while undergoing interferon treatment. Finally, she noted she had given him an assessment for his liver doctor, stating Mr. Power was able to make informed decisions regarding his treatment and that TCV MH/MR services would be following him.[16] (Tr. 210-212.)

Dr. Kubrin again saw Mr. Power on June 8, 2005, at which time she described him as still anxious regarding his body and sleep, although his paranoia was slightly milder than before. His interferon treatment had been postponed for a month when an endoscopy and MRI showed his stomach was inflamed and did not empty correctly. He had now been sober for five months. (Tr. 207-209.)

_____

[16] On July 5, 2005, Mr. Power consulted with Dr. Thomas A. Shaw-Stiffel in anticipation of beginning the interferon treatment. (Tr. 243-245.) Although that doctor's notes also refer to the fact that Plaintiff provided a letter indicating that he had been psychiatrically cleared for the treatment, the letter does not appear in the record.

16

On August 8, 2005, Plaintiff appeared tired and subdued. He felt his medications were helping, although after he had started interferon the previous week, he experienced increased depression and physical side effects as well as interrupted sleep. (Tr. 204-206.) At the final medication check in Dr. Kubrin's records dated October 17, 2005, Mr. Power reported that he had been very depressed while taking interferon which he had stopped two weeks earlier due to severe side effects, although tests showed it had helped his liver condition. He remained depressed over medical issues although after he stopped the interferon treatment, his sleep and mood had improved. (Tr. 201-203.)

There are other passing references to Plaintiff's depression and his treatment for it, but no evidence of significance. For instance, Dr. Schlossberg prescribed Klonopin to help him sleep, but there is no indication it had been prescribed for any depression or other mental impairment. (Tr. 125.) In the course of treatment for his hepatitis, Mr. Power apparently mentioned to Dr. Sudhir K. Narla in January 2004, that he had been prescribed Klonopin for depression which "dated back a couple of years." Dr. Narla advised Mr. Power that "his continuing use of alcohol and history of depression would be considered as relative contraindications for any interventional therapy" pertaining to his hepatitis C. (Tr. 142.) In the report of a consultative physical examination performed on April 1, 2004, Dr. Curtis Waligura noted

17

Mr. Power had mentioned his history of hepatitis, alcoholism, chronic low back pain and difficulty sleeping, but there was no complaint of depressive symptoms or any other mental impairments, even though he was being treated by Dr. Alam at the time. (Tr. 144-148.) There is also a reference in the notes of Dr. Thomas A. Shaw-Stiffel, a specialist in gastroenterology, hepatology and nutrition at the University of Pittsburgh Medical Center, to the fact that Plaintiff would need psychiatric clearance before he could begin the interferon treatment. (Tr. 151-154.) (See additional reports of depression at Tr. 237, 319, 338, 343, 346, 352, 355, 358, 388, and 389.)

2. *The ALJ's treatment of the medical evidence*: The ALJ specifically noted the psychiatric evaluation perform by Dr. Alam in February 2004 and his diagnostic impressions. He concluded Plaintiff's mood disorder was "non-severe, since it imposes no more than minimal functional restrictions." He further noted Mr. Power had received psychiatric clearance to begin interferon therapy on two occasions and that he had shown a "good response" to medication. He also referred to Plaintiff's mental status evaluation by Dr. Kubrin on October 17, 2005, in which his appearance, mood, affect, thought processes, orientation and insight were all described as within normal limits and his appearance as pleasant and animated. From this medical evidence and from his own observation that during the hearing, Mr. Power

"demonstrated excellent ability to communicate his thoughts clearly, in an organized manner responsive to the questions," Judge Kenworthy concluded Plaintiff's "depression has responded well to treatment and . . . imposes no more than mild limitation upon any domain of functioning." (Tr. 16.) He did not include Mr. Power's depression or other mood disorder among his "severe" impairments.

When posing the hypothetical questions to Mr. Edelman, however, the ALJ did include the restriction that any jobs which might be suggested could not include tasks that would involve a rapid production pace, frequent changes in job assignments or similar sources of a high level of work place stress. (Tr. 463.) These limitations were also included in the RFC determined by the ALJ at step four of his analysis. (Tr. 16.)

3. *Plaintiff's arguments about the ALJ's determination that his mental impairments were not severe:* Plaintiff raises four related arguments regarding the ALJ's conclusion that his mood disorder caused no more than a minimal effect on his functioning and that his mental impairments were not "severe." (Plf.'s Brief at 7-8.) First, Plaintiff objects to the fact that from the medical evidence pertaining to his mental impairments, the ALJ discussed the February 2004 initial evaluation by Dr. Alam and Dr. Kubrin's notes from October 17, 2005, but failed to address any other evidence between those dates.

We note initially that the ALJ is not required to discuss

19

every piece of medical evidence in the record. Fargnoli v. Halter, 247 F.3d 34, 42 (3d Cir. 2001). The two reports he specifically mentioned span the entire period of Plaintiff's mental health treatment available to the ALJ at or prior to the hearing on January 11, 2006, and he accurately summarized their content. As we have summarized above, the evidence from between February 2004 and October 2005 generally shows that when Plaintiff refrained from alcohol and took his medication, his depression decreased. The evidence also shows that Plaintiff received no mental health treatment between April and November 2004, had stopped taking his medications, and had returned to alcohol use in the interim. By February 16, 2005, three months after Plaintiff resumed treatment and refrained from alcohol, Dr. Kubrin described him as less depressed, although anxious, with a continued somatic focus; his insight and judgment which had previously been described as limited were now considered within normal limits. (Tr. 213-215.) Similar continued improvement was reflected in Dr. Kubrin's notes of April 13 and June 8, 2005, prior to beginning interferon treatment. Moreover, although he reported to Dr. Kubrin in October 2005 that his depression had been a factor in deciding to stop the interferon treatment, notes from his physician at the Center for Liver Diseases, Dr. Tranovich, dated December 5, 2005, indicate that he stopped secondary to constipation, decreased appetite, and constant

20

headaches[17] and that he was motivated at the time to try the treatments again. (Tr. 241.) Thus, we conclude that although the ALJ did not specifically mention each of the interim reports, his summary of Plaintiff's mental health treatment by Drs. Alam and Kubrin was complete and reflected the severity of Plaintiff's impairments in an unbiased manner.

Second, Plaintiff argues that the ALJ never discussed the moderate to severe limitations in functioning which both Dr. Alam and Dr. Kubrin had found based on his GAF scores between 50 and 59. The omission of any discussion of his GAF scores is, according to Plaintiff, sufficient reason to remand for further administrative proceedings. (Plf.'s Brief at 12-13, relying on Colon v. Barnhart, 424 F. Supp.2d 805, 813-816 (E.D. Pa. 2006).)

Neither Social Security regulations nor case law requires an ALJ to determine a claimant's disability based solely on his GAF scores. See Ramos v. Barnhart, CA No. 06-1457, 2007 U.S. Dist. LEXIS 23561, \*33-\*34 (E.D. Pa. Mar. 30, 2007), and cases cited therein. Under Social Security rules, a claimant's GAF score is not considered to have "a direct correlation to the severity requirements" of the Administration's mental disorders listings. See "Revised Medical Criteria for Evaluating Mental Disorders and Traumatic Brain Injury," 65 Fed. Reg. 50746, 50764-50765 (August

---

[17] There is a fourth reason indicated in Dr. Tranovich's notes which the Court is unable to decipher.

21, 2000); *see also* Chanbunmy v. Astrue, CA No. 07-3098, 2008 U.S. Dist. LEXIS 85486, *29-*30 (E.D. Pa. May 21, 2008), *citing* Camp v. Barnhart, No. 03-7132, 2004 U.S. App. LEXIS 13527, *4 (10th Cir. June 30, 2004) ("[A] GAF score, without evidence that it impaired the ability to work, does not establish an impairment.") Moreover, the ALJ's failure to discuss the claimant's GAF scores, standing alone, is not a basis for remand because "[w]hile a GAF score may be of considerable help to the ALJ in formulating the RFC, it is not essential to the RFC's accuracy." Howard v. Comm'r of Soc. Sec., 276 F.3d 235, 241 (6th Cir. 2002). We further note that Plaintiff's only score which indicates serious symptoms, i.e., 50, was reported in February 2004 at the very beginning of his psychotherapy and medication under Dr. Alam's direction; all his other scores were between 55 and 59, indicating only moderate symptoms. A score of 50 is generally considered borderline between moderate and serious symptoms. *See* Colon, 424 F. Supp.2d at 809, n.3. In fact, the United States Court of Appeals for the Third Circuit has noted that a GAF score of 50 is not dispositive as to a claimant's ability to work inasmuch as it indicates the person "could perform some substantial gainful activity." Hillman v. Barnhart, No. 02-1416, 2002 U.S. App. LEXIS 21344, *9, n.1 (3d Cir. Sept. 26, 2002). And finally, despite Plaintiff's reliance on Colon, that case is distinguishable on its facts because the ALJ therein cited two out of 12 GAF scores over a period of six years,

22

indicating Colon had only mild to moderate symptoms but ignored other scores in the 50 to 60 range. Here, the ALJ did not discuss any GAF scores and, contrary to Plaintiff's argument, did not "cherry pick" the evidence in this regard. While we agree that a discussion of Plaintiff's GAF scores would have made the ALJ's analysis more complete, since all but one of the reported scores reflect his psychiatrists' opinion that Mr. Power evidenced only moderate symptoms, we cannot conclude this omission requires remand simply because the GAF scores were not addressed.

Next, Plaintiff objects to the fact that the ALJ failed to mention Dr. Kubrin's opinion expressed in a letter dated March 16, 2006, in which she stated that Mr. Power

is under psychiatric treatment at Turtle Creek Valley Mental Health Center. He suffers from depression and anxiety. Mr. Power is disabled and unable to maintain employment due to his mental health condition. Additionally, he is currently involved in a treatment for liver disease that has negatively impacted his mental health. Mr. Power has experienced an increase in his mental health symptoms as a side effect from this necessary liver treatment.

(Plf.'s Brief at 13, *citing* Tr. 430.)

Plaintiff's reliance on this letter is entirely misplaced since it is clear from the record that the ALJ did not have Dr. Kubrin's letter before he entered his decision in this case on February 16, 2006. Therefore, it cannot be argued that he ignored a report he did not have. Even if he had received Dr. Kubrin's letter, it is well-established in Social Security regulations and

the case law that the opinion - even by a treating physician - that a claimant is disabled or unable to work is an issue reserved to the Commissioner of Social Security. See 20 C.F.R. §§ 404.1527(e)(1) and 416.927(e)(1)); *see also* Zonak v. Comm'r of Soc. Sec., No. 07-3413, 2008 U.S. App. LEXIS 15885, *7 (3d Cir. July 24, 2008) (the ALJ was not obligated to give significant weight to the physician's opinion as to the claimant's ability to work because the opinion related to the ultimate issue of disability is an issue reserved exclusively to the Commissioner.)

Finally, Mr. Power objects to the ALJ's apparent reliance on the fact that he was psychiatrically cleared for interferon treatments as proof that his mental impairments were less than severe, but failed to recognize that the hepatitis C treatment itself significantly exacerbated his mental health problems, as reflected in the fact that he stopped treatment after only one month. (Plf.'s Brief at 13.)

Plaintiff actually testified that he stopped treatment after 10 weeks, considerably longer than one month, and that the side effects he experienced were thirst, particularly at night, feeling "run down pretty bad," constipation, chills, severe headaches, and fatigue (Tr. 450, 454-455, 457), all of which are consistent with Dr. Tranovich's notes (Tr. 241.) Mr. Power described interferon as "an extremely depressive medication," and testified that his psychiatrist was going to increase his anti-depressants before he

24

began the second attempt at treatment. (Tr. 459.) To the extent Plaintiff relies on a Pennsylvania Department of Public Welfare Employability Re-Assessment Form provided by Dr. Shaw-Stiffel in which he stated that Mr. Power would be temporarily disabled from March 1, 2006, through February 28, 2007, while undergoing hepatitis C treatment, we note the physician did not indicate that Mr. Power's disability would result from mental impairments associated with the interferon treatments, nor did he indicate that the treatment would exacerbate his mental impairments. (Tr. 434-437.) We also note that this form was dated March 2, 2006, again well after the ALJ reached his decision in this case.

Having considered the medical evidence and the Plaintiff's arguments, we conclude the ALJ's summary and analysis of Mr. Power's mood disorder was accurate and that substantial evidence supported his conclusion that Plaintiff's mental impairments were not severe.

4. *Plaintiff's arguments regarding the ALJ's hypothetical question:* Plaintiff's second major argument is that because the hypothetical question the ALJ posed to the vocational expert did not accurately set forth all of his specific work-related limitations, the VE's response thereto cannot be considered substantial evidence on which the ALJ could rely for his conclusion that other work existed in the national and local economies that Mr. Power could perform. Consequently, the matter must be remanded

for further consideration or, alternatively, the Court should award benefits. (Plf.'s Brief at 15.)

At the hearing, the ALJ posed the following question to the vocational expert:

. . . assume an individual with the claimant's age, education and work experience and assume that he would be capable of carrying out work at the light exertional level lifting up to 20 pounds occasionally and avoid[ed] work characterized [by] rapid production pace; frequent changes in job assignments or similar sources of a high level of stress. With those capabilities and limitations are there jobs that could be performed?

(Tr.463.)

A proper hypothetical question is one which includes all the claimant's limitations credibly established in the record. Ramirez v. Barnhart, 372 F.3d 546, 552-555 (3d Cir. 2004), Plummer v. Apfel, 186 F.3d 422, 431 (3d Cir. 1999). This includes limitations which are not severe. Burnett v. Commissioner of SSA, 220 F.3d 112, 122 (3d Cir. 2000) ("the ALJ must consider the combined effect of multiple impairments, regardless of their severity.") However, the ALJ is not required to incorporate every limitation alleged by a claimant. As the Court explained in Rutherford, hypothetical questions must "accurately portray" the impairments and the vocational expert must be given an opportunity to evaluate those medically established impairments "as contained in the record." Rutherford, 399 F.3d at 554. Where the claimant asserts limitations which lack objective medical support, the ALJ may reject such limitations based on conflicting evidence in the

26

record, "but should not reject a claimed symptom that is related to an impairment and is consistent with the medical record simply because there is no objective medical evidence to support it." Rutherford, id.

Here, the ALJ found that Plaintiff's mood disorder and other mental impairments were not severe, based on his review of the medical evidence. (Tr. 16.) At the hearing, however, Mr. Power testified that he experienced physical and mental fatigue which were "just unbelievable," his mind was "never there," he could not concentrate or focus, he had a hard time functioning in daily life, and the "mental tiredness is awful." (Tr. 450-451.) He further commented that the "paranoia of the situation" "wears on you and stresses you out to a point where it's just extremely hard to deal with." (Tr. 459-460.) In the hypothetical question, the ALJ incorporated limitations which reflected these self-described symptoms and eliminated jobs which required a rapid production pace, frequent changes in job assignment, or other sources of a high level of stress. We conclude these limitations reflect Plaintiff's otherwise unsupported mental impairments accurately and that the question posed was not deficient.

Having considered each of Plaintiff's arguments in support of his motion for summary judgment, we find none of them persuasive. Summary judgment is therefore granted in favor of Defendant. An appropriate order follows.

March  ＿＿＿, 2009

_William L. Standish_
William L. Standish
United States District Judge